# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
## No. 12-4455

| | |
|---|---|
| MARC SALAHUDDIN, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | ) |
| | ) |
| FRANK SHEWALTER, WARDEN, | ) |
| | ) |
| Appellee. | ) |

## APPLICATION FOR A CERTIFICATE OF APPEALABILITY
## UNDER 28 U.S.C. § 2253(c)(1)(B)

Petitioner-Appellant, Marc Salahuddin, by undersigned counsel, hereby

requests a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c)(1)(B) to

appeal of the District court's denial of Mr. Salahuddin's 28 U.S.C. § 2254 petition.

Further support for this request is set forth in the attached supporting

memorandum.

Respectfully submitted,
ROBERT L. TOBIK, ESQ.
Chief Public Defender


*s/Erika Cunliffe*
ERIKA CUNLIFFE, 0074480
310 Lakeside Avenue, Suite 200
216-443-8353
Peachliffe1@yahoo.com

**MEMORANDUM IN SUPPORT OF CERTIFICATE OF APPEALABILITY
UNDER 28 U.S.C. § 2253(c)(1)(B)**

I.     INTRODUCTION

This Court should grant Mr. Salahuddin's request for a certificate of
appealability (COA) to address two questions.  First, this Court should consider
and clarify whether an indictment, charging hundreds of identical counts alleging
repeated instances of misconduct over an extended period of time, fails to comply
with constitutional notice requirements and the double jeopardy clause.  The
second issue this Court should address is this one – Given the district court's
obligation to undertake a *de novo* review of the magistrate judge's Report and
Recommendation when the parties submit objections, is it proper for the district
court to decline any consideration of those objections?  Because reasonable jurists
could undertake a spirited debate over these issues, this Court should grant a COA
as to both.

II.     STANDARD OF REVIEW

Those undertaking to appeal from an adverse district court ruling on a
petition for writ of habeas corpus, must first obtain a certificate of appealability
(COA).  See, 28 U.S.C. §2253 as amended by the Antiterrorism and Effective
Death Penalty Act [AEDPA] of 1996 (Pub. L. No 104-132, 110 Stat. 1214). Under
28 U.S.C. §2253(c), AEDPA provides in pertinent part:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from ó (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063, 1073 (6th Cir. 1997), this Court held that a district court may ó and should ó issue the COA in the first instance. A district court should engage in a reasoned assessment of each claim presented by the petitioner, as required by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).

In *Slack,* the Court explained what the petitioner needed to demonstrate before he would be entitled to obtain a COA pursuant to 28 U.S.C. § 2253:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

3

*Slack*, 529 U.S. at 484.

The High Court expanded upon this standard in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). There, the Court determined that when evaluating a request for a COA, the court "should limit its examination to a threshold inquiry into the underlying merit of [the] claims" and determine whether they reveal a "substantial showing of the denial of a constitutional right." *Id.* at 327 (citing *Slack*, 529 U.S. at 481), and 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. *Id.*

While the COA determination under § 2253(c) requires an overview of the habeas claims and a general assessment of their merits, it "does not require full consideration of the factual or legal bases adduced in support of the claims." *Miller-El v. Cockrell*, 537 U.S. at 336. Thus, the district court's decision on the merits of the claims is not determinative of their appealability. "[A] COA determination is a separate proceeding, one distinct from the underlying merits . . . .The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342.

4

Accordingly, a COA does not require the petitioner to show that the appeal will succeed. "A court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Id.* at 337. The petitioner "has already failed in that endeavor." Id. (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983). A petitioner need only show that the claim is debatable among reasonable jurists, not that some jurists might grant the petition for habeas relief. *Miller-El*, 537 U.S. at 338.

Obtaining a COA also requires that the petitioner "make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate over  whether the petition should have been resolved in a different manner or that issues presented were adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 483-84; citing *Barefoot*, 463 U.S. at 894.  According to this analysis, then, the petitioner need only "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 US. at 484.

In Mr. Salahuddin's case, the district court denied his request for a COA before he had even asked for one.  That denial was issued in a summary order with no analysis, tersely concluding that the case presented no issues from which an appeal could be taken.  This Court requires more from the district court.  In

*Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001), when the district court issued a similar õblanket denialö of a COA, this Circuit vacated the order and remanded the case so that the district court could engage in a reasoned assessment of each claim presented, as required by the Supreme Court in *Slack*, 529 U.S. 473. See *Murphy*, 263 F.3d at 467.  This Court explained that without findings it had no way of knowing whether and the extent to which the district court had considered the issues raised in light of the applicable COA standards.  This Court noted that the district court had abdicated its responsibility obligations under the law, õeffectively delegate[ing] the COA determination process to this Court, thereby "undermin[ing] the gate keeping function of certificates of appealability." *Id.* (internal quotations omitted)

For the reasons discussed above and further herein, this Court should reconsider and overrule the district courtøs wholesale rejection of a COA in this case and grant a COA on the two issues addressed herein because reasonable jurists could find the courtøs dismissal of these claims subject to debate.

III.    PROCEDURAL AND FACTUAL SUMMARY

**The Charges and their Disposition**

A Cuyahoga County grand jury initiated the case against Marc Salahuddin on June 26, 2006, with a 103-count indictment alleging dozens of identical

instances of rape, gross sexual imposition (GSI) and kidnapping during two time periods. The allegations were all at least 13 years old.

The charges broke down this way: Counts 1 - 10 alleged rape, R.C. 2907.02(A)(1)(b); Counts 11 - 22 charged Gross Sexual Imposition, R.C. 2907.05(A)(4); and Counts 23 - 34 charged kidnapping, R.C. 2905.01(A)(2). Counts 1 - 34 alleged conduct which transpired between January 1, 1990 and November 16, 1991 and involved a child under 13 years of age. Counts 35 - 57 charged rape, R.C. 2907.02(A)(2); Counts 58 - 80 charged GSI, R.C. 2907.05(A)(1); and Counts 81 - 103 charged kidnapping. Counts 34 through 103 alleged conduct which occurred between November 17, 1991 and November 16, 1993. The charged offenses involved Mr. Salahuddin's stepdaughter, identified as I.S.

A jury trial began in April of 2007. At the close of the state's case, rape counts 8 - 10; GSI counts 20 - 22, kidnapping counts 23 - 34; rape counts 47 - 57; and kidnapping counts 70 - 103, were dismissed for insufficient evidence. The remaining counts were submitted to the jury. (Tr. 1150-1155) When the jury deadlocked, the court declared a mistrial.

When another jury trial commenced on November 26, 2007, the State renumbered the counts: Counts 1 – 7 remained the same. Counts 11 - 19 became Counts 8 - 16. Counts 35 - 46 became Counts 17 - 28. Counts 58 - 69 became

Counts 29 - 40.  After the State completed its case-in-chief, the trial court granted
the defense Rule 29 motion for acquittal on GSI Counts 15 - 16, rape Counts 17 -
26 and GSI Counts 33 - 40.

The jury returned guilty verdicts on Counts 1 -14, which charged
indistinguishable rape and GSI incidents allegedly transpiring between January
1990 and November of 1991.  The jury also found Mr. Salahuddin guilty of rape as
alleged in Count 27, not guilty of rape as alleged in Count 28.  The jury found Mr.
Saladin guilty of GSI in Counts 29 and 30, but acquitted him on Counts 31 and 32.
The trial court sentenced Mr. Salahuddin to life imprisonment terms on Counts 1
through 7, with Counts 2 through 7 to be served concurrently to each other but
consecutively to Count one. [1]

The state court of appeals affirmed.  The court summarily rejected Mr.
Salahuddin's challenge to the indictment's sufficiency, under a plain error
standard, because trial counsel had not sought the indictment's dismissal prior to
trial.  The state court also rejected Salahuddin's challenge to his trial's fairness
given the jury's exposure to allegations about multiple uncharged acts of sexual
misconduct and other irrelevant, but disturbing and prejudicial evidence.  Mr.

---

[1] The trial court also imposed concurrent 10-year terms on Counts 8 - 14.  On
Count 27, the court imposed a consecutive term of 5 ó 25 years with concurrent
terms of 1½-5 years on counts 29-30.

Salahuddinøs claims raising ineffective assistance of trial counsel and prosecutorial misconduct were similarly disregarded.  See, *State v. Salahuddin*, Cuyahoga App. No. 90874, 2009 Ohio 466. The Ohio Supreme Court refused jurisdiction over the matter. *State v. Salahuddin*, 122 Ohio St.3d 1412, 2009 Ohio 466.

Mr. Salahuddin filed a petition for habeas corpus relief in the District court on June 10, 2010. (Doc. No. 1)  The Warden opposed the petition.  (Doc. No. 6) The Magistrate Judge issued a Report recommending the petitionøs dismissal. (Doc. No. 16)  Mr. Salahuddin objected to that recommendation.  (Doc. No. 19) On October 30, 2012, the district court denied Mr. Salahuddinøs objections ó refusing to even consider objections to the Magistrateøs resolution of Grounds Three, Four and Five ó and dismissed the petition.  (Doc. No. 20) The district court also summarily declined to issue a COA on any claim.

**Factual Background**

In the summer of 2006, when the complainant ó I.S. ó was an adult in her mid-twenties, she went to the Cleveland Police Department with allegations that her stepfather, Petitioner Marc Salahuddin, had sexually assaulted her repeatedly more than a dozen years earlier.  I.S. had been estranged from her family since June 8, 1999, when Salahuddin and I.S.øs mother Cassandra, had ordered I.S. and her then boyfriend, Salahuddinøs brother Robin, to leave the family home in Killeen, Texas.  (Tr. 479, 922)  I.S., who was then 19-years-old, had been carrying

on sexually Robin, and her parents were concerned about the effect the affair might have on the couple's younger children.  (Tr. 638, 818, 892)

The separation prompted several painful public incidents and left bad feelings all around.  (Tr. 899)  Marc and Cassandra remained permanently estranged from I.S. and Robin.  I.S. lived with Robin in Texas until the fall of 2004, when I.S. suffered, what she termed, a "nervous breakdown." (Tr. 640)  I.S. was placed in Scott and White Hospital, in Lubbock, Texas, to recover from an "emotional disturbance."  (Tr. 490)

Cassandra was serving with the army in Iraq at the time and took emergency leave to see I.S. (Tr. 642-643, 830) The meeting went badly. Cassandra recalled that I.S. was talking crazy and seemed unhinged.  (Tr. 830)  I.S. also found the encounter unsatisfying.  During her hospital stay, she came to believe that her "breakdown" was related to the sexual abuse she claimed to have suffered as a child. (Tr. 491)  I.S. shared these concerns with hospital doctors, who recommended that she undergo "therapy."  Recalling her meeting with Cassandra, I.S. wanted to talk about Marc's sexual abuse, but her mother would have none of it, and they parted on "a bad note."  (Tr. 492, 642)

In December of 2004, I.S. called the Texas Department of Child Protection (DCP) and reported concerns that her younger brother and sister might be vulnerable to sexual abuse.  (Tr. 493)  DCP investigators went to the Salahuddin's

10

Killeen, Texas home, found that it was disarray and took the children into

õprotective custody.ö  (Tr. 831-902)

Approximately 18 months later, the children were returned to Cassandra and

Salahuddin without further conditions. (Tr. 725, 927-933)  Thereafter, I.S.

approached the Cleveland Police with accusations that her stepfather repeatedly

sexually assaulted her between January of 1990 and November of 1993.

**Prosecution's Case at Trial**

The prosecutionøs entire case derived from I.S.øs account.  As noted above

the first trial ended with a deadlocked jury.  At the second trial, the case case again

turned on I.S.øs testimony, which supplied the only firsthand account of the abuse.

To the extent that the prosecution called additional witnesses, all they did was echo

what I.S. had told them.

By the time this case was tried in 2008, I.S. was nearly 30 years old.  (Tr.

332)  Her testimony reflected back on incidents that she initially claimed began

nearly 20 years previously, in 1990, when she was twelve.  (Tr. 394)  At some

point, however, I.S.øs testimony changed, and she claimed that Salahuddin started

abusing her in 1989, when she was 11 years old. (Tr. 520)

To that end, I.S. recalled that the first incident occurred in 1989 ó before the

abuse alleged in the indictment. (Tr. 520) She, Marc, and her mother had spent the

evening together.  They ate dinner, watched a movie on a sofa bed in the living

room.  I.S. testified that the three of them routinely slept on that pullout couch together, with Marc in the middle and she and Cassandra on either side.  (Tr. 368, 417)  On this particular night, I.S. recalled that she had fallen asleep and awoke in the middle of the night to find that Marc's hand under her nightgown squeezing her breast.  (Tr. 369)  I.S. moved away and he stopped.  (Tr. 370)

I.S. thought that the next incident occurred in the spring or summer of 1989. I.S. claimed that she and Marc were lying fully clothed on the pullout couch and Marc rubbed his erect penis against her rear end. (Tr. 371-372)  I.S. recalled that he told her not to tell anyone because people would think her a "dirty girl."  (Tr. 373) She told her mother about the breast grabbing episode "two days later."  (Tr. 373) I.S. claimed that her mother knew about the abuse but did nothing to stop it. (Tr. 374-75)

When Marc first met I.S.'s mother, he was married to another woman. They eventually split up and Marc married Cassandra in 1990.  Sometime in 1988, during fourth or fifth grade, she and her mother moved to a second floor apartment in Cleveland's Ohio City neighborhood. (Tr. 507-508, 515)  Marc later moved into a space downstairs in the same building. (Tr. 361-364)  Because I.S. continued to attend schools on the City's east side, transportation to and from school became difficult.  (Tr. 365)  During this time, she often lived with her grandmother during the week, returning to her mother on weekends and occasionally taking the public

12

bus to school.  (Tr. 366) About five or six months before Salahuddin and Cassandra got married (in October of 1990), I.S. and her mother moved in with Salahuddin.  (Tr. 407)

The abuse continued. According to I.S. Marc began to caress and put his fingers inside her vagina. (Tr. 376)  I.S. testified that while he was touching her, Marc made tiny cuts on her vagina with his fingernails, which caused her pain when she urinated.  (Tr. 378)  Eventually, he raped her with his penis.  (Tr. 377) I.S. relayed that this incident occurred in the downstairs apartment on West 22nd Street. (Tr. 386)

I.S. recalled Marc always ejaculated on her chest.  (Tr. 390) I.S. recalled one incident occurring when it was sunny outside, so it had to be during the day, "*maybe on break or summertime*," and during that incident Marc sucked on her breast and fondled her vagina.  (Tr. 380) (emphasis added)  I.S. explained that the abuse *generally* went this way:  "When there were incidents of rape, *typically it would be* kissing and the touching, caressing, sucking on my breast, fondling my vagina; him telling me how to touch his penis, how to suck on his nipples, like that *usually went along with an incident*." (Tr. 454) (emphasis added)

I.S. estimated that Marc put his fingers in her vagina and on her clitoris "about 20 *or so*" times. (Emphasis added)  She said, "*pretty much* every time that I came to my mom's house on the weekends, after some time with them being

13

together, *an event* would occur.  Then, like longer when I would be there in the

summers, *something* would happen.ö  (Tr. 405) (Emphasis added).  Cassandra was

working fulltime and attending school then.  I.S. claimed she was alone with Marc

when these incidents would happen.

When I.S. entered seventh grade, she transferred to Whitney Young Junior

High School.  The family moved to a building within walking distance from the

school.  The building was not zoned for residential use, but people lived there

anyway. When they first moved in, Cassandra was pregnant with M.S. ó who was

born on June 26, 1991. (Tr. 337)  I.S. remembered that it was very hot, the building

had no air conditioning, no phone, and Cassandra spent a lot of time at Marilyn

Davisø house where it was cooler.

Sometime after I.S. turned 13, the family moved to a two-bedroom

apartment on Warrensville Center Road. (Tr. 465)  Cassandra was in school

fulltime.  Marc had, what I.S. characterized as, õoccasional military duties, but it

wasnøt a monthly thing.  It was just kind of off and on; reserve, I think, duties.ö

(Tr. 464) She testified that she was often alone with Marc.  Once when they were

together in the living room he sat on the pullout sofa, told her to get on her knees

and forced his penis into her mouth. (Tr. 465)  She testified that she resisted and

locked herself in the bathroom.  This was the only sex act that I.S. claimed to

remember at the Warrensville Center apartment location. (Tr. 466)

I.S. finished junior high school in the spring of 1993, and left home to attend boarding school in Rhode Island. (Tr. 466-467) Cassandra joined the army. The rest of the family moved with Cassandra to North Carolina where she was stationed. (Tr. 471, 600) In 1996, when I.S. was 17 years old, her birth father Michael Richardson signed away his parental rights and, at I.S.'s request, Marc formally adopted her. (Defense Exs. D, F, W, Tr. 611-613)

When I.S. graduated from high school, she moved to Killeen, Texas where Cassandra was then stationed. (Tr. 477, 614) I.S. testified that Marc continued to touch her sexually, though less frequently, as the years progressed, and the abuse did not stop until she left home in 1999. I.S. remained involved with Marc's brother, Robin, until October, 2004, when I.S. experienced what she called a "psychotic episode," and she spent seven days in the hospital. (Tr. 489) The doctors at the hospital medicated her and discussed the possibility of receiving "therapy," but there was no "permanent diagnosis." (Tr. 490) Although trial counsel subpoenaed those psychiatric records, the hospital refused to provide them without a court order. After her release, I.S. returned to Cleveland.

**Defense Case**

Salahuddin denied abusing I.S. and maintained that she was either delusional or lying. (First Trial, Tr. 850, 856) Cassandra similarly denied the allegations. Cassandra denied leaving I.S. home alone in their apartment with Marc, and further

explained that I.S. never had to take a public bus from the Ohio City apartment to her east side elementary school. (Tr. 770)  When I.S. did not stay with Cassandra's mother, Cassandra would drive I.S. to school. (Tr. 766, 771) Cassandra was usually able to arrange her schedule so that she could be home when I.S. was there. (Tr. 916-917)

According to Cassandra, I.S. never told her that Marc had been sexually inappropriate.  (Tr. 774)  Had I.S. done so, Cassandra would have confronted Marc and gone to the police.  The incident I.S. recounted where she supposedly came home and found I.S. in bed with Marc did not happen, and if it had, Cassandra would have called the police.  (Tr. 788)

Cassandra joined the Army in January of 1993, remaining with the service for 14-years.  During that time, she traveled a great deal.  (Tr. 807)  The family moved to Texas in 1997 to be near Fort Hood, where Marc was stationed and she was transferred. (Tr. 814)  She and Marc bought a house in Killeen, and I.S. followed the family there.  When Salahuddin's brother, Robin, also moved in, I.S. and Robin became sexually involved.  That relationship eventually led to the June 8, 1999 incident that permanently fractured the family.  (Tr. 818-825).

In August of 2004, Cassandra returned the States from Iraq to meet briefly with I.S.  She returned again in December to find her house empty and her children taken from her. (Tr. 831)  The Department of Child Protection and Family Services

eventually returned both children to Cassandra and Marc without restriction and dismissed the case.  (Tr. 834)

IV    <u>ARGUMENT</u>

Mr. Salahuddin understands that at this stage, this Court scrutinizes his case to determine whether reasonable jurists could debate the district court's holdings. *Slack*, 529 U.S. at 484. As explained below, in light of the issues presented, reasonable jurists could debate 1) whether the charging instrument used in this case violated the Constitution; and 2) whether the applicable rules allow a district court to simply disregard specific objections to the magistrate judge's Report.  The issues are debatable and justify this Court's scrutiny.

**Reasonable jurists could debate whether an indictment charging hundreds of identical counts alleging repeated instances of misconduct over an extended period of time fails to comply with notice principals and the double jeopardy clause.**

When they are able, prosecutors must to inform criminal defendants about how each count in an indictment differs from another.  This principle is grounded in thoroughly established Supreme Court precedent.  See, *Russell v. United States*, 369 U.S. 749 (1962); and *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007). This Court has addressed indictment clarity and differentiation in circumstances similar to the one presented here and concluded that multiple count indictments alleging indistinguishable misconduct that is not otherwise anchored to specific

offenses can violate the Double Jeopardy Clause, the accused's right to notice, and compromise his ability to defend himself. *Valentine v. Konteh*, 395 F.3d 626, 633 (6th Cir. 2005).

<u>Notice and the Ability to Prepare for Trial</u>

Because the allegations in Mr. Salahuddin's case were not only indistinguishable from each other, but also extremely dated and numerous, his indictment actually generated more notice and double jeopardy problems that the situation the defendant faced in the *Valentine* case.  Mr. Salahuddin was charged with more than 100 indistinguishable counts, all dating back more than 13 years. The charges in *Valentine*, on the other hand, were reasonably current.  That indictment involved twenty "carbon-copy" counts of rape, "each identically worded so that there was no differentiation among the charges." *Valentine* at 628. The court noted that each rape count "charged that Valentine -unlawfully engaged in sexual conduct with [his stepdaughter] not his spouse by purposefully compelling her to submit by the use of force or threat of force," *Id* at 629. The language in the *Valentine* indictment is the same as that used to charge Mr. Salahuddin.

As in Salahuddin's case, the defendant in *Valentine* sought a bill of particulars.  That effort, however, failed to "offer further differentiation among the counts.  Instead, [the bill of particulars] merely restated the allegations and

identified the family home as the location of all forty offenses." *Id.*  Relying on

*Russell v. United States*, supra, this Court ruled that *Valentine's* indictment was

deficient.  In *Russell*, the Supreme Court held that indictments must contain the

elements of the offense charged and sufficiently apprise the offender of what he

must be prepared to meet at trial. *Id.* at 763-764.

This Court noted that the indicted counts Valentine faced met *Russell's* first

prong because they set out the elements of the crimes charged.  Nevertheless, this

Court concluded that the "multiple, undifferentiated" nature of the charges violated

Valentine's rights to notice and his right to be protected from double jeopardy.

*Valentine*, at 631.  This Court observed that the Valentine's indictment really

charged a "generic pattern of abuse rather than forty separate abusive incidents." *Id*

at 643.   Since the State could not properly secure a conviction for engaging in a

pattern of abuse, this Court vacated all but two of Mr. Valentine's convictions,

ruling that Valentine had sufficient notice and opportunity to defend himself

against one count of rape and one count of felonious sexual penetration. It also

noted that by permitting only one conviction for each crime, the remedy also

prevented any danger that Valentine would be denied protection from double

jeopardy. The *Valentine* court affirmed one conviction apiece for rape and

felonious sexual penetration, vacating the remaining counts. *Id* at 637-638.

19

At the very least, such a remedy was justified in Mr. Salahuddin's case.  As vague, and utterly void of detail, as Mr. Valentine's indictment was, the one charging Mr. Salahuddin was worse.  Other than the two time frames alleged, the Counts were indistinguishable from each other.    Counts 1 - 34 alleged 10 identically charged rape incidents, and 12 identical GSI and kidnappings between January 1, 1990 and November 16, 1991, when the accusing witness was 13-years-old or younger.  Counts 34 - 103 alleged 23 indistinguishable rape, GSI, and kidnapping incidents occurring between November 17, 1991 and November 16, 1993.  Not even a location was disclosed until I.S. testified.

After the state presented its case during the first trial, 63-counts were dismissed during Crim. R. 29 proceedings:  Three each of the rape and GSI counts when the complaining witness was 13 and younger; 11 of the rapes alleged to have occurred between 1991 and 1993; none of the later GSIs and all of the kidnapping counts. (First Trial Tr. 555)  The remaining 40 counts were submitted to the jury, which deadlocked on everything. After the court declared a mistrial the State proceeded to a second trial with the remaining counts renumbered one through 40. At the conclusion of the second trial, the Court partially granted Mr. Salahuddin's Crim. R. 29 motion and dismissed two of the early GSI counts; 10 of the forcible rape charges; and eight of the later GSI charges.

By the end of the second trial, only 20 counts were left for the jury to deliberate on.  It found Mr. Salahuddin guilty of seven counts each of rape and GSI alleged in Counts 1 ó 14, a rape in Count 27, and GSI in Counts 29 and 30.  Yet the jury acquitted him of an identically charged rape in Count 28 and the GSIs in Counts 31 and 32.

Other than the two different time frames into which the alleged misconduct was divided, the rape, GSI and kidnapping allegations were indistinguishable from each other.  The bill of particulars parroting the indictment did *nothing* to further distinguish the allegations. The jury instructions and the jury's verdict sheets are likewise unilluminating   The vagueness of this indictment, which contained repetitive counts restating the statutes it purported Mr. Salahuddin violated more than a dozen years ago, provided no information about when, where and what actually occurred.  Mr. Salahuddin was a Major in the Army's Special Operation Forces.  In that capacity, he often found himself on missions out of town and/or outside of the United States for extended periods of time.  Had the indictment charged even rudimentary specifics with respect to time/date or place, he may well have been able to mount an alibi at trial.  With such information wholly lacking, however, no such defense was possible.

Double Jeopardy Considerations

The Double Jeopardy Clause protects against successive prosecutions for the same offense. *United States v. Dixon*, 509 U.S. 688, 696 (1993). This provision creates an important counterweight to government power and recognizes that,

> The State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.*, quoting *Green v. United States*, 355 U.S. 184, 187-188 (1957).

Because of the multiplicative and undifferentiated nature of Mr. Salahuddin's indictment and the fact that so many of the counts were dismissed during the first trial's Rule 29 proceedings, Mr. Salahuddin's retrial was prohibited under the Double Jeopardy Clause. See *Valentine*, *supra* at 636. The double jeopardy guarantee protects a defendant's "valued right to have his trial completed by a particular tribunal." *Crist v. Bretz*, 437 U.S. 28, 36 (1978), quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949). "Once a tribunal has decided an issue of ultimate fact in the defendant's favor, the double jeopardy doctrine also precludes a second jury from ever considering that same or identical issue in a later trial." *Isaac v. Grider*, 211 F.3d 1269, *5 (published in full at 2000 U.S. App. LEXIS 9629) (6th Cir. 2000).

Mr. Salahuddin's case was tried twice. When the case proceeded to trial the first time, Mr. Salahuddin faced 103-counts. After the state put on its evidence, Mr. Salahuddin's counsel moved to dismiss counts pursuant to Crim.R. 29. The prosecutor acknowledged that the State would dismiss a total of 63 counts. Accordingly, of the 103 counts originally indicted, 63 were dismissed as part of the Rule 29 proceedings. At that point, jeopardy had attached, and the prosecution was barred from retrying the dismissed counts. The dismissed rape and GSI allegations were identical to the ones that remained. The jury deadlocked on the 40 counts and Mr. Salahuddin was again forced to run the gauntlet of prosecution. Double jeopardy principles rendered the second prosecution invalid.

In *Isaac v. Grider*, supra, this Court found that charging a defendant on multiple identically worded sodomy counts put him at risk of double jeopardy. Specifically, the defendant in Isaac was indicted with five identical counts of second-degree sodomy and five identical counts of second-degree sexual abuse. The trial court directed verdicts on four of the ten counts and the jury convicted on the remaining six counts. A judgment for acquittal entered by a judge invokes the protections of the Double Jeopardy Clause. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573-74 (1970).

This Court concluded that "the identical charges introduced the risk of double jeopardy and, indeed, may have already resulted in double jeopardy in this

prosecution." *Id*. In *Isaac*, this Court had no way of telling the dismissed/acquitted counts from the ones on which the jury convicted. This Court noted that "[t]he jury instructions did not advise the jury as to the court's directed verdicts, and the instructions did not limit the jury's consideration of the evidence relating to [the child victim]." The fact that the number of incidents described by the victim exceeded the number of counts in the verdict forms was also troubling.

Under the circumstances, the case presented the very real risk that the jury found Isaac guilty of conduct on which the trial court had already concluded the evidence was insufficient. As in Mr. Salahuddin's case, neither the indictment that charged *Isaac*, nor the jury instructions identified which factual incidents were connected to which charges. It was therefore possible that the jury either convicted Isaac of counts for which he had been acquitted or convicted him without jury unanimity on the underlying factual offenses. Id. at *14.

In Mr. Salahuddin's case, the record reflects that the directed acquittals of duplicative counts happened twice. During the first trial, at the court's direction the state dismissed 63 duplicative counts. (First Trial, Tr. 545-555) During the second trial, the Court granted Mr. Salahuddin's Rule 29 motion for a directed acquittal of still 20 more duplicative counts. (Tr. 743; Journal Entry – dated November 30, 2008, App. 4). Following this Court's reasoning in *Isaac*, the state

24

court and the District Court should have concluded that Mr. Salahuddin's convictions violated the Double Jeopardy Clause.

In light of these circumstances, Mr. Salahuddin contends that reasonable jurists could debate whether his indictment was sufficient to 1) provide notice to prepare for trial and 2) avoid the possibility of double jeopardy.

> **Given the District Court's obligation to undertake a *de novo* review of the Magistrate's Report and Recommendation in light of Petitioner's Objections, reasonable jurists could differ concerning whether the District Court's refusal to consider those objections was proper.**

When the district court chooses, it may delegate certain functions to a magistrate judge to offer proposed findings and recommendations with respect to certain matters.  In the instant matter, the district court did precisely that.  In a report issued on May 2, 2012, the magistrate judge recommended that the district court reject Mr. Salahuddin's petition for habeas corpus relief in its entirety.

Mr. Salahuddin submitted his objections to the magistrate judge's proposal on June 15, 2012.  When a party objects to the magistrate judge's proposed recommendations, the district court must review the contested portions of the magistrate judge's proposal *de novo*.  28 U.S.C. §636(b)(l); *U.S. v. Raddatz*, 447 U.S. 667, 673-74(l980); *Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir. l988). Failure to do so constitutes reversible error.  *E.E.O.C. v. Keco Industries, Inc.*, 748 F.2d l097, ll02 (6th Cir. l984).  In conducting a *de novo* review, the District Court

may accept, reject, or modify any of the magistrate's findings and recommendations.  28 U.S.C. §636(b)(l);  *Raddatz*, 447 U.S. at 673-74, 680.

When the district court issued its Memorandum Opinion and Order adopting the magistrate judge's Report and Recommendation, it only addressed Salahuddin's objections to the magistrate's resolution of Ground One.  As for Salahuddin's objections to the recommendations on Grounds Three, Four and Five, the district court deemed them too õgeneralö and refused to consider them. The Court noted that the objections õsuperfluously recite portions of the Petition and Traverse, and are therefore not recognized as objections as a matter of law.ö  (Doc. 20, p. 7)  The court went on to complain that, õSuch ÷general objectionsø are a duplication of time and effort and a waste of judicial resourcesö which fall outside the purposes of Federal Rule of Civil Procedure 72(b).  (Doc. 20, p.7)

Putting aside the tone and tenor of the district court's characterization, it does not accurately describe the objections' validity or merit.  As discussed further herein, Mr. Salahuddin's objections to the magistrate judge's resolution of his Third, Fourth and Fifth claims were actually pretty specific.  At the very least, they constituted õproper objectionsö as contemplated under Rule 72(b)(3)  (Federal Rules of Civil Procedure.

The district court might not have liked the objections, or perhaps the claims themselves. It might have even found reviewing and addressing them tiresome, but

ennui does not equate to a waste of judicial resources.  Nor do the objections in this case compare to the rambling *pro se* submission that received similar treatment in *Alrich v. Bock*, 327 F.Supp.2d 743, 747 (E.D. Mich. 2004) – the case on which the district court relied in according Mr. Salahuddin's objections such contempt.

Getting to specifics, in Ground Three, Mr. Salahuddin argued that his rights to present a defense, a fair trial, and due process were violated by the trial court's rulings – allowing the introduction of unfair, irrelevant, but extremely damaging evidence, but excluding evidence relevant to Salahuddin's defense.  The magistrate recommended rejecting that claim, finding 1) that Salahuddin has not offered any ruling from the Supreme Court governing the subject; and 2) that the evidence introduced did not violate his rights under the Constitution.

Mr. Salahuddin objected to that recommendation.  In doing so, he identified clearly established Supreme Court precedent, along with cases from this Court acknowledging its application to the kinds of trial court error reflected in Mr. Salahuddin's case.  See, *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir.2000); and *White v. Macanich*, 235 F.3d 988 (6th Cir. 2000). In addition, Mr. Salahuddin took issue with the magistrate judge's conclusion that what occurred at his trial did not rise to the level of a Constitutional violation. How this objection could have been any more specific is hard to imagine.

In Ground Four, Mr. Salahuddin maintained that his trial counsel provided ineffective representation and that the state court of appeals' finding to the contrary was unreasonable. The magistrate judge rejected this claim as well, stating, "To the extent that Petitioner has failed to show that any of issues (sic) he raised on direct appeal constituted error, he has likewise failed to show that trial counsel's failure to object to those matters constitutes ineffective assistance of counsel." (Doc. 16, p. 35)

At no point during the magistrate judge's analysis of this claim did it place counsel's lapses into the trial context. The evidence in this case was not strong. Counsel repeatedly failed to object to improper evidence and arguments. Moreover, the magistrate (with respect to Ground Five) and other courts (the Eighth District with respect to Ground One) have actually concluded that Salahuddin's trial counsel has caused several issues Mr. Salahuddin has raised to be defaulted because he failed to interpose timely objections. In his objections Mr. Salahuddin noted these concerns. At the very least, given its obligations under Rule 72 of the Federal Rules of Civil Procedure, the district court was obligated to respond to them.

The district court also heaped scorn on Ground Five, which challenged the prosecutor's improper closing arguments. The magistrate judge concluded that the issue was defaulted because trial counsel failed to object to the arguments when

they were made.  The district court concluded that further consideration was a waste of its time.  The arguments were, nevertheless, improper.  And they were not offered in isolation.  They were intended to convince the jury that, even though the state's case was riddled with shortcomings, it should find Mr. Salahuddin guilty so the court could sentence him to a lengthy prison sentence.  If trial counsel failed to object to these arguments, then counsel was ineffective.  Mr. Salahuddin should not be wrong on both fronts.  At the very least, the district court should have scrutinized the magistrate judge's conclusions and undertaken to justify them in the face of Salahuddin's objections.

Reasonable jurists could debate over whether the district court violates its duty and the petitioner's right to Federal Habeas Corpus review where it refuses to follow its obligations under the applicable law and rules.  In this case, reasonable jurists could also take issue with the district court's description of Mr. Salahuddin's objections, given that the objections were specific as to each Ground, not general, as the district court claimed.

V       CONCLUSION

Reasonable jurists could debate the district court's conclusion that the 103 count indictment, alleging indistinguishable crimes occurring dozens of years in the past, provided Mr. Salahuddin with adequate notice and did not violate the Double Jeopardy Clause.  They could also debate whether the district court could

properly refuse to consider Mr. Salahuddin's remaining objections.  Under the circumstances, Mr. Salahuddin requests that this Court grant him a certificate of appealability.

Respectfully submitted,

*/s/ Erika B. Cunliffe*
ERIKA B. CUNLIFFE (0074480)
Assistant Public Defender
Cuyahoga County Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113
(216) 443-7580

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document captioned Appellant's Request for a Certificate of Appealability was filed electronically on January 30, 2013, and that all parties will be served through the Court's electronic filing system.

*/s/ Erika B. Cunliffe*
ERIKA B. CUNLIFFE (0074480)
Assistant Public Defender
Cuyahoga County Public Defender

30